UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :

UNITED STATES OF AMERICA            :

        - v. -                                :          23 Cr. 133 (JMF)

ROBERT SCHIRMER,                     :

                       Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA


                                                       Damian Williams
                                                       United States Attorney for the
                                                       Southern District of New York
                                                       Attorney for the United States of America


Katherine Reilly
Danielle Kudla
Kevin Mead
Qais Ghafary
Assistant United States Attorneys
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA                             :
:
      - v. -                                    :    23 Cr. 133 (JMF)
:
ROBERT SCHIRMER,                                     :
:
                Defendant.           :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The defendant in the above-captioned action is scheduled to be sentenced in this matter on August 27, 2024 at 10:30 a.m. The Government respectfully submits this memorandum in advance of that sentencing. The United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range applicable to this defendant is 46 to 57 months' imprisonment.[1] For the reasons set forth below, and consistent with the recommendation of the United States Probation Office ("Probation"), the Government submits that the Court should impose a sentence of 24 months' imprisonment.

## BACKGROUND

### I. The Offense Conduct

#### A. Overview

The defendant was charged, along with nine co-defendants, with participating in a more than decade-long kickback scheme designed to defraud Polar Air Cargo Worldwide, Inc. ("Polar"), a cargo airline headquartered in the Southern District of New York and one of the world's leading

---

[1] The parties' plea agreement calculated a Guidelines range of 37 to 46 months' imprisonment based on a loss estimate that has since been revised, as described herein. The Government intends to honor the Guidelines range set forth in the plea agreement.

air-cargo companies, of tens of millions of dollars in revenue and the honest services of its employees. (PSR ¶¶ 9, 10). More specifically, several senior executives of Polar—indeed, at times, the majority of executives in senior management at the company, including the defendant— defrauded Polar by corrupting Polar's relationships with general sales agents ("GSAs"); customers who aggregated freight shipments, also known as freight forwarders; and other vendors, including those providing ground handling and trucking services. (*Id.* ¶ 14). Unbeknownst to Polar, these executives utilized their positions within Polar to secure, among other things, favorable contracts, valuable cargo space, favorable shipping rates, and enrollment in various incentive programs in exchange for the payment of kickbacks in various forms, including, for example, in payments calculated per kilo of cargo shipped with Polar, or as a percentage of the revenue earned as a result of a vendor's relationship with Polar. (*Id.*). In addition, certain executives held concealed ownership positions in companies that contracted with Polar, receiving ownership distributions based, in large part, on revenue derived from contracts with Polar—contracts that had been secured and often times renewed due to, in large part, the recommendation of the executives with conflicts of interest. (*Id.*).

This fraud led to pervasive corruption of Polar's business, touching nearly every aspect of the company's operations, for more than a decade. Between 2009 and July 2021, when the fraud was discovered, the Polar executives involved in the scheme received unlawful payments, either directly or through various limited liability companies they controlled, in excess of approximately $23 million. (PSR ¶ 16). During the same period, Polar suffered at least approximately $32 million in losses as a result of the fraudulent conduct.[2]

---

[2] The PSR indicates that the total losses from the scheme are approximately $43 million. (PSR ¶ 16). The Government has engaged in extensive discussion with counsel for various defendants

The defendant, specifically, received approximately $983,759.32 in proceeds of the various kickback and fraud schemes described above between 2014 and 2021, including approximately $512,000 from freight forwarder Cargo on Demand, approximately $186,000 from freight forwarder Fato LLC, and approximately $285,000 from GSA Gateway Cargo Consolidators. (PSR ¶ 39).

B.  The Polar Business Model

As set forth above, Polar is one of the world's leading air-cargo companies, in the business of transporting freight by air on behalf of a variety of customers all around the globe. (PSR ¶¶ 9, 10). Polar is the result of a 2007 joint venture between a publicly traded airline, headquartered in the Southern District of New York, and a leading provider of courier and package delivery services (the "Courier Company"). (*Id.* ¶ 12). The joint venture was designed, in part, to ensure that the Courier Company had dedicated cargo space on flights operated by Polar, in order to transport parcels in a reliable and timely manner. (*Id.*).

During the period charged in the Indictment, from 2009 through July 2021, Polar relied heavily on third-party, general sales agents ("GSAs") in the United States to sell the cargo space that was not allocated to the Courier Company. (PSR ¶ 13). This available cargo space was intended to be sold at shipping rates consistent with market demand. (*Id.*). In turn, the GSAs hired by Polar often sold available cargo space to freight forwarding vendors, which had been hired by downstream customers to coordinate transportation logistics for large quantities of goods. (*Id.*). Polar also contracted with a variety of other vendors and business partners to provide various services, including, for example, trucking and ground handling. (*Id.*).

C.  The Polar Executives

---

charged in the Indictment and has, as a result of those discussions, arrived at this more conservative estimate of loss.

The Indictment charges four former executives of Polar, all of whom have now pleaded guilty: the defendant, Lars Winkelbauer, Abilash Kurien, and Carlton Llewellyn (collectively, the "Executive Defendants").

The defendant was hired by Polar in 2010 and in 2013 was promoted to Senior Director of Customer Services for the Americas, a position in which he remained until his employment was terminated in July 2021. (PSR ¶ 21).

Lars Winkelbauer was hired by the Courier Company in 2007, having served as a Polar employee for several years before that. (PSR ¶ 18). Although Winkelbauer was technically employed by the Courier Company from 2007 through July 2021, for the majority of that time, the Courier Company seconded Winkelbauer to work for Polar in various senior leadership roles. (*Id.*). Specifically, from 2007 through 2014, Winkelbauer served as Polar's Vice President of Marketing, Revenue Management, and Network Planning, and from 2018 until he was terminated in or about July 2021, Winkelbauer served as Polar's Chief Operating Officer and Executive Vice President. (*Id.*).

Abilash Kurien was hired by Polar in or about 2008 and served as Senior Director of Business Development and Excellence from 2008 through 2014. (PSR ¶ 19). In 2014, Kurien succeeded the defendant as the Vice President of Marketing, Revenue Management, and Network Planning, a position in which he remained until his employment was terminated in July 2021. (*Id.*).

Carlton Llewellyn was hired by Polar in 2006. (PSR ¶ 20). From January 2017 until his employment was terminated in July 2021, Llewellyn was Polar's Vice President of Operations, System Performance, and Quality. (*Id.*).

Two additional senior executives of Polar played a critical role in the scheme charged in the Indictment, conspiring with the Executive Defendants to accept kickbacks and conceal

5

ownership payments from their employer. Specifically, "CC-1" was hired by Polar in or about 2007, as Vice President of Sales and Marketing for the Americas, a position in which he remained until his employment was terminated in July 2021.[3] (PSR ¶ 22). Additionally, Frank Filimaua—identified as "CC-2" in the PSR—was hired by Polar in 2002 as a Regional Sales Manager and, in 2010, was named the Senior Director of Global Sales, a position in which he remained until his employment was terminated in July 2021.[4] (*Id.* ¶ 23).

The Executive Defendants, along with CC-1 and Filimaua, gained significant knowledge of and influence over Polar's operations, including sales, contracting, and selection of vendors. (PSR ¶ 24). Winkelbauer and Kurien, in particular, oversaw significant segments of Polar's business and, thus, had visibility into Polar's sales, customer relationships, and operations, including ground handling and trucking. (*Id.*). In general, the Executive Defendants often had the ability to propose vendors, to advocate on behalf of certain vendors or customers, and to exercise significant influence over both Polar's selection of vendors and the rates offered to its customers. (*Id.*).

### D. The Freight Forwarding Kickback Scheme

Throughout the period charged in the Indictment, Polar contracted with freight forwarders to sell available cargo space on behalf of downstream shipping customers, who, in turn, paid freight forwarders to secure cargo space and coordinate logistics. (PSR ¶ 30). The Indictment charges

---

[3] CC-1 died in 2022.

[4] Filimau is charged in a case pending before Judge Carter. *United States v. Filimaua*, 22 Cr. 261 (ALC). He has pleaded guilty, pursuant to cooperation agreements, to conspiracy to commit honest services wire fraud and wire fraud, substantive honest services wire fraud and wire fraud, conspiracy to commit money launder, tax evasion, and engaging in monetary transactions in property derived from specified unlawful activity. He has not yet been sentenced.

the owners of four different freight forwarding customers of Polar—Patrick Lau, Alberto Lopez, Orlando Wong, and Benjamin Wei (collectively, the "Freight Forwarder Defendants").[5] (*Id.*). The Freight Forwarder Defendants all paid kickbacks, in various combinations and at various times, to the defendant, Winkelbauer, Kurien, Filimaua, and CC-1, in exchange for favorable rates for cargo space, preferred access to cargo space, and involvement in customer incentive programs. (*Id.*). These kickbacks were typically calculated based on how many kilograms of cargo the freight forwarders had shipped with Polar during a particular period. (*Id.*).

    a.  <u>Cargo on Demand</u>

Cargo on Demand, Inc. ("COD") was a freight forwarder operated by Lau, who between 2016 and July 2021, paid kickbacks to the defendant, Winkelbauer, Kurien, Filimaua, and CC-1 in exchange for favorable business arrangements with Polar, including access to cargo space on preferred terms, despite COD often being past due on its accounts with Polar. (PSR ¶ 31). The payment of these kickbacks was facilitated by Lopez initially in his capacity as a sales employee of Griffin, Polar's GSA for the New York region in which COD operated, which was also involved in the GSA-kickback scheme. (*Id.*).

The defendant corresponded with co-conspirators on several occasions about the favorable treatment afforded to COD as a result of these kickbacks. (PSR ¶ 32). For example, on March 9, 2021, Lau contacted Kurien to register a complaint about the rates being offered to COD to ship cargo with Polar. (*Id.*). When Kurien pushed back, Lau wrote to Kurien, "Well Abi, just so you know I am doing my business not just for myself, but also protecting the Brotherhood and is pie

---

[5] In addition to the freight forwarders they controlled, Wong, Wei, and Lopez also operated or assisted in the operation of other entities, including GSAs and a ground handling company, that were involved in the charged scheme.

ya . . . ." (*Id.*). Kurien responded to Lau, "Just so you know, your shipments don[']t cover the whole cost of transportation and is a loss of Polar and we cannot be seen further reducing that rate from where it is agreed to be. I don[']t like it when you say you are protecting the brotherhood because you know very well - we have also been protecting you…You were late many months on the receivables[,] etc[.][,] and we still made sure you are not put on cash and your BSA remains valid." (*Id.*). Kurien's reference to COD's "BSA" is a reference to the "blocked space agreement" between COD and Polar, under which Polar guaranteed space for COD at certain rates. (*Id.*) Kurien later forwarded the exchange to the defendant, who responded to Kurien, "Should we pay him to move the cargo…?" (*Id.*). Later, in June 2017, Lopez emailed the defendant, Kurien, and CC-1 with "the calculation for May as requested[.]" (*Id.*). Kurien then replied to all, noting that he was not happy with the rates. (*Id.*). Afterwards, the defendant solely responded to Kurien, defending COD's rates and writing, "COD does have options on who they use east coast and west coast, I think we need to be careful on how we tackle this.. I for one do not what to loose [sic] what we are currently getting, its paying for my early retirement...." (*Id.*).

In total, between 2016 and July 2021, COD, through its owner, Lau, paid approximately $1.6 million in kickbacks either directly to the defendant, Winkelbauer, Kurien, Filimaua, CC-1, and Lopez, or through limited liability companies that they controlled, including approximately $512,000 to the defendant. (PSR ¶¶ 33, 39).

      b. Fato

Fato LLC ("Fato") was owned and operated by Lopez, who in 2017 began to pay kickbacks on an intermittent basis to the defendant, Kurien, and CC-1 in exchange for favorable business arrangements and contracts with Polar, including preferential cargo space terms and identification

as a preferred freight forwarder of Polar. (PSR ¶ 34). These benefits were awarded to Fato despite Fato maintaining substantial past due balances in its accounts with Polar. (*Id.*).

Specifically, Lopez and the defendant engaged in two separate schemes related to Fato. (PSR ¶ 35). *First*, in November 2016, the defendant and CC-1 invested in a Peruvian division of Fato by paying Lopez approximately $50,000 each. (*Id.*). Lopez was hesitant about this ownership arrangement but worried that if he did not agree, the defendant and CC-1 would cause problems with Fato U.S.'s business, which depended heavily on its relationship with Polar. (*Id.*). Rather than decline the offer, Lopez never deposited CC-1's check. (*Id.*). Although Lopez deposited the defendant's check, he paid the defendant $50,000 a short time later. (*Id.*). Lopez never disclosed to the defendant that the money was intended to be a return of the defendant's Fato Peru investment. (*Id.*). Lopez likewise did not reveal that he did not view the defendant and CC-1 as equity partners in Fato Peru, because he did not want to anger them or risk upsetting his arrangements with Polar. (*Id.*). Indeed, over the years, Lopez consulted with the defendant and CC-1 about certain Fato Peru decisions and paid them Fato Peru commissions. (*Id.*). *Second*, beginning in 2017, Fato, through Lopez, began to pay regular kickbacks, based on a rate per kilo Fato shipped with Polar, to the defendant, Kurien, and CC-1 and, beginning in 2018, to Winkelbauer and, beginning in 2021, to Filimaua, as well. (*Id.*).

Lopez communicated regularly with the defendant and others regarding both schemes. (PSR ¶ 36). For example, on May 11, 2016, Lopez emailed the defendant and CC-1 with the subject, "Cash flow and projection FAT LIM," arranging a conference call to discuss Fato's performance in Lima, Peru. (*Id.*). Likewise, on December 20, 2017, Lopez emailed the defendant and CC-1, providing an update on Fato's performance in Peru. (*Id.*). Lopez wrote that based on the distributions he estimated, "the initial investment is fully recovered plus a little extra…Not

9

bad." (*Id.*). He added, "Now, for the US, I would like to discuss in person us three the renewal of the Fato BSA and also put the contract in place[.]" (*Id.*).

Lopez also kept the defendant and others apprised as to the second scheme. (PSR ¶ 37). For example, on May 8, 2019, Lopez emailed the defendant and CC-1 using their personal email accounts and attaching a spreadsheet of all of the cargo shipped by Fato through Polar. (*Id.*). The spreadsheet includes a "Total" page, which appears to carry out a calculation of 5% of the total, divided by two, to reach a payment figure. The email notes "TOTAL for the year attached[.] Pending payment $45,832.95[.] Payment will be done in 2 parts or 3 worst case. First payment this Friday 20k." (*Id.*). The email was sent as a "reply all" to a similar email detailing payments sent the prior October. (*Id.*). On June 16, 2021, Lopez sent the defendant and CC-1 an email listing "Total KGS" shipped in various categories, with commission rates, and "Cash out each[.]" (*Id.*). The email noted "We basically double last year's as expected……….We will make 2 deposits and attached is the breakdown. Note that we do not pay for ecommerce to the group[,] but we were able to get some spots therefore we accured [sic] for distribution only for you." (*Id.*). The defendant responded and asked that Lopez send "9K daily to the account on file until the 110,208.49 has been met[.]" (*Id.*).

In total, between 2017 and July 2021, Fato, through its owner, Lopez, paid at least approximately $800,000 in kickbacks to the defendant, Winkelbauer, Kurien, Filimaua, and CC-1 either directly or through limited liability companies that they controlled, including approximately $185,000 to the defendant specifically (PSR ¶¶ 38, 39).

E. The GSA Illicit Payment Scheme

Throughout the period charged in the Indictment, Polar relied heavily upon GSAs in the United States to sell available cargo space, often to freight forwarders. (PSR ¶ 36). In various

combinations, multiple Executive Defendants and others agreed with employees and owners of GSAs to defraud Polar through the payment of kickbacks on behalf of the GSAs. Specifically, the defendant, Winkelbauer, and Kurien agreed with Lopez and Lopez's wife, Fabiola Cino, to defraud Polar through the payment of kickbacks on behalf of Gateway in exchange for favorable business arrangements and contracts with Polar. (PSR ¶ 25). Before discovering the fraud in July 2021, Polar had no knowledge of the kickbacks paid by any of the corrupt GSAs, including Gateway. (*Id.*)

      a. <u>Gateway</u>

Gateway was a GSA owned and operated by Cino. (PSR ¶ 26). From November 2015 through 2021, Polar contracted with Gateway to sell domestic cargo space for the Miami, Florida, region. (*Id.*). Beginning in at least early 2016, Cino agreed to pay kickbacks to the defendant, Kurien, and CC-1 in the form of a percentage of Gateway's net profits arising from its contract with Polar, in exchange for Polar's use of Gateway as its GSA in the Miami, Florida, region and other favorable business arrangements. (*Id.*). In August 2020, at about the same time that Gateway's territory was expanded to include Central America, and its sales commission increased, Cino, the defendant, Kurien, and CC-1 agreed to share the kickback payments paid by Gateway with Winkelbauer. (*Id.*).

On a periodic basis starting in March 2016, Cino and Kurien exchanged emails, sometimes copying others, in which they attached spreadsheets setting forth Gateway's monthly income, expenses, and, in some cases, a four-way split of the net revenues between Cino, the defendant, Kurien, and CC-1. (PSR ¶ 27). For example, on April 20, 2016, Kurien sent an email to the defendant, Cino, and CC-1, writing "March numbers and split attached." (*Id.*). The spreadsheets attached showed the calculations leading to a four-way split of $1,645.69 per person of that month.

(*Id.*)  On May 24, 2016, Kurien emailed a new spreadsheet to the same group, writing "Here is April figure. Please arrange distribution." (*Id.*).  Cino replied, "I will take care of it next week." (*Id.*).

All of the executives, including the defendant, appear to have been paid through LLCs and issued 1099s by Gateway.  (PSR ¶ 28).  For example, in February 2018, the defendant and Cino exchanged emails in which Cino inquired as to where the defendant wanted the monthly kickback payment, about $4,700 that month, to be sent, and the defendant provided information for a TD Bank account held in the name of Chantalle LLC.  (*Id.*).  Chantalle LLC was formed in 2011 and nominally owned by the defendant's wife; however, the defendant exercised control over Chantalle LLC and used it to receive fraud scheme proceeds, as aforementioned.  (*Id.*).  On April 20, 2020, the defendant emailed a co-conspirator ("CC-3") a photo of the 2019 Form 1099 issued to Chantalle LLC by Gateway.  (*Id.*).  On May 14, 2021, the defendant emailed the 2020 Form 1099 issued by Gateway to CC-3.  (*Id.*).

In total, Gateway paid more than $900,000 in kickbacks, from profits derived from Polar, to limited liability companies controlled by the defendant, Winkelbauer, Kurien, and CC-1, including approximately $285,000 to the defendant specifically.  (PSR ¶ 29).

**II.    The Procedural History**

On March 13, 2023, a grand jury sitting in this District returned an Indictment charging the defendant and nine others in connection with the fraudulent scheme described above.  Specifically, the defendant was charged with one count of conspiring to commit wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); one count of substantive wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Two); one count of substantive honest services wire fraud, in violation of Title 18, United States

Code, Sections 1343, 1346, and 2 (Count Three); and one count of conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count Four).

On October 24, 2023, the defendant pled guilty, pursuant to a plea agreement, to a one count Superseding Information charging him with conspiring to commit wire fraud and honest services fraud, in violation of 18 U.S.C. § 371.

### III.     The PSR and the Applicable Guidelines Range

Probation has calculated an offense level of 23, as follows:

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for Count One is six.  (PSR ¶ 53).

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), because the loss amount is greater than $9,500,000 but less than $25,000,000, 20 levels are added.  (PSR ¶ 54).

- Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of public or private trust, two levels are added.  (PSR ¶ 56).

- Pursuant to U.S.S.G. §3E1.1, because the defendant accepted responsibility, the total offense level is reduced by three levels.  (PSR ¶¶ 59-60).

- Pursuant to U.S.S. §§4C1.1(a) and (b), because is a Zero-Point Offender, the total offense level is reduced by two levels.  (PSR ¶ 61).

The defendant has no prior criminal history point, resulting in a Criminal History Category of I.  (PSR ¶ 65).

Based upon these calculations, the defendant's advisory Guidelines range is 46 to 57 months' imprisonment. (PSR ¶ 100).

The parties' plea agreement calculated a Guidelines range of 37 to 46 months' imprisonment based on a total offense level of 21 resulting from a loss amount of $9,340,729.

Subsequent to the defendant's guilty plea, the Government, in consultation with Polar, revised its estimates of the financial loss incurred by Polar as a result of the defendant's crime to approximately $9,740,749. Thus, while Probation's Guidelines calculation is correct, the Government intends to honor the Guidelines range set forth in the plea agreement.

## DISCUSSION

The Section 3553(a) factors—and particularly the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence—support a sentence of 24 months' imprisonment as sufficient but not greater than necessary. 18 U.S.C. § 3553(a)(2)(A)-(B). The defendant seeks a non-incarceratory sentence, which is a significant downward variance from both the parties' stipulated Guidelines Range of 37 to 46 months' imprisonment and the Guideline Range of 46 to 57 months' imprisonment set forth in the PSR. The defendant seeks such a variance despite having played an important role in a long-running scheme to defraud his employer, having personally received nearly $1 million in kickbacks, and having taken steps to conceal his crime to allow it to continue. The nature and circumstances of the defendant's conduct does not support a non-incarceratory sentence. Rather, the mitigating factors that the defendant highlights, coupled with the seriousness of the defendant's crime, the need to promote respect for the law and to afford adequate deterrence, counsel in favor of a downward variance to no lower than a 24-month term of imprisonment, consistent with Probation's recommendation.

**I.    The Seriousness of the Offense and Promotion of Respect for the Law**

The defendant served as Polar's Senior Director of Customer Services for the Americas, a position he held from 2013 until July 2021, when his employment was terminated. (PSR ¶ 21). The defendant, alongside the other Executive Defendants, used his knowledge of and influence

14

over Polar's operations to enrich himself and his coconspirators at the expense of Polar and Polar's legitimate business partners. The defendant abused his position of trust with his employer in order to facilitate and conceal the yearslong fraud scheme, cause Polar to lose millions of dollars, and line his own pockets to the tune of nearly $1 million. (*Id.* at ¶¶ 39-40, 56).

As the Court is aware, the defendant was a member of a massive conspiracy to defraud Polar of tens of millions of dollars in revenue and the honest services of its employees. (PSR ¶ 10). Between 2009 and July 2021, when the fraud was discovered, the Polar executives involved in the scheme received more than $23 million in unlawful payments and caused Polar to suffer at least approximately $32 million in losses as a result of the fraudulent conduct. (*Id.* at ¶ 16). Despite the defendant's questions about the calculation of estimated loss attributable to his conduct (*see* Def. Mem. (Dkt. No. 310) at 12-13), it is uncontested that over $9 million out of the $32 million worth of financial harm to Polar is attributable to the defendant's participation in the fraud (PSR ¶ 40)—through his direct participation in the kickback scheme associated with COD, Fato, and Gateway.

While the defendant did not sit atop the various kickback schemes, he played an important role in ensuring their smooth operation and success. The defendant was intimately involved in multiple kickbacks schemes with Polar freight forwarders. He regularly communicated with COD owner Lau, Kurien, and others to help implement the COD scheme, from which the defendant personally made over a half million dollars. (PSR ¶¶ 31-33, 39). Indeed, on one occasion, when Kurien expressed frustration with Lau and the rates that COD was being granted, the defendant separately wrote to Kurien in order to defend COD's rates and ensure that the COD scheme could continue uninterrupted, writing, "COD does have options on who they use east coast and west coast, I think we need to be careful on how we tackle this.. **I for one do not what to loose [sic]**

15

**what we are currently getting, its paying for my early retirement**...." (*Id.* at ¶ 32 (emphasis added)). The defendant also participated in the Fato kickback scheme and, as with COD, regularly communicated with the scheme participants to ensure its success. (*Id.* at ¶¶ 36-37). In addition to the per kilo kickbacks from Fato owner Lopez, the defendant even went so far as to secure an ownership stake in the Peruvian division of Fato, handing Lopez a $50,000 check as his investment in the company. (*Id.* at ¶ 35.) Clearly the defendant's intentions were to increase and expand his share of the fraud proceeds. Ultimately, the Fato scheme generated approximately $800,000 in kickbacks for the Polar insiders, of which the defendant personally received approximately $185,000. (*Id.* at ¶¶ 38, 39).

The defendant likewise helped execute the scheme involving Polar GSA Gateway Cargo. Beginning in at least early 2016, Gateway-owner Cino agreed to pay kickbacks to the defendant, Kurien, and CC-1 in the form of a percentage of Gateway's net profits arising from its contract with Polar, in exchange for Polar's use of Gateway as its GSA in the Miami, Florida, region and other favorable business arrangements. (PSR ¶ 26.) The defendant received approximately $285,000—nearly a third of the total kickbacks that Cino paid to the Polar insiders—as a result of his participation in the Gateway scheme. (*Id.* at ¶ 29). Moreover, like the other Executive Defendants, the defendant took extensive steps to conceal his criminal conduct. Notably, the defendant used a TD bank account held in the name of Chantalle LLC, a company nominally owned by the defendant's wife, to receive his fraud proceeds. (*Id.* at ¶ 28).

What is most important is not just that the defendant worked to continue to line his own pockets with criminal proceeds, but that he was a crucial player to the success of the scheme. Generally speaking, each piece of the scheme involved payments to those Polar Executives who might have been a position to uncover the illicit conduct based on their responsibilities. The

16

defendant, who was integrally involved in Polar's sales operations, particularly in the Miami region, might have alerted Polar to the favorable arrangements offered to Fato, Gateway, or COD, had he not been given a piece of the scheme's proceeds. His willingness to engage in this criminal conspiracy allowed the corruption of Polar's business to continue unabated.

Additionally, the defendant's offense conduct does not reflect a momentarily lapse in judgment or peripheral role in the fraud scheme. The defendant played an active role, as a mid-level participant, over the course of multiple years to ensure that multiple kickbacks schemes operated smoothly and successfully, and were profitable for himself and other Executive Defendants. A custodial sentence of 24 months would appropriately reflect the seriousness of the defendant's offense conduct and promote respect for the law. At the same time, a 24-month term would constitute a significant downward variance from the Guidelines range and appropriately account for the defendant's position in the conspiracy and his early acceptance of responsibility.

## II. Deterrence

A Guidelines sentence is also necessary here to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The payment of kickbacks and corruption of business dealings is, sadly, not uncommon. Indeed, the Government interviewed witnesses in connection with this investigation who expressed that this kind of criminal conduct was, in some parts of the cargo shipping business, considered par for the course. Employees of businesses in a variety of industries are trusted every day not to make these kinds of choices, choices which could lead to substantial harm to their employers and to honest players in any marketplace. This is especially true of executives, like the defendant, whose conduct may well go unchecked because they operate higher up on the corporate ladder. The sentence imposed in a case like this must send a clear message that not only is this kind of conduct criminal, it is serious, and it will lead to serious

consequences for the perpetrators. *See, e.g., United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 U.S. Dist. LEXIS 71257, at * (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime….'[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.'") (quoting *United States v. Stein*, No. 09 Cr. 377 (JW), 2010 U.S. Dist. LEXIS 16745, at *3 (E.D.N.Y. Feb. 25, 2010)).

Moreover, these crimes can often be challenging to identify, investigate, and prove. Indeed, in the instant case, the defendants continued their criminal conduct, undetected, for years. The Executive Defendants, including the defendant, controlled or influenced much of Polar's operations and so when an employee or a customer raised concerns, they were in a position to quash them, which they did, multiple times over the course of years. Indeed, it was only a matter of relative happenstance—an internal investigation of an unrelated issue—that led Polar to discover documents on the computer of an employee that unearthed evidence of this long-running scheme. Because crimes like the defendant's may often go unprosecuted, the punishment imposed in a case like this sends an important message of general deterrence to would-be wrongdoers. *See United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (quoting *United States v. Herrernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) for the proposition that "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish…."). The imposition of a custodial sentence is necessary to provide adequate deterrence to future criminal conduct of the sort the defendant and his coconspirators carried out.

### III. The Imposition of Forfeiture and Restitution

The Government respectfully requests that whatever sentence is imposed include the imposition of forfeiture in the amount of $983,759.32 and restitution to Polar in the amount of

$9,340,729. A Consent Preliminary Order of Forfeiture was previously entered in connection with the defendant's change of plea proceeding (*see* Dkt. No. 163 (Tr. of Oct. 24, 2023 Proceeding at 25:10-19)), and a Proposed Order of Restitution is attached hereto.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of 24 months' imprisonment is appropriate and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing. The Government also respectfully requests that forfeiture and restitution be imposed consistent with the plea agreement.

Dated: New York, New York
August 19, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By: _____/s/_____
Katherine Reilly
Danielle Kudla
Kevin Mead
Qais Ghafary
Assistant United States Attorneys
(212) 637-6521/2304/2211/2534